**NOT FOR PUBLICATION**

RECEIVED

JAN - 7 2011

AT 8:30_____M
WILLIAM T. WALSH
CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| KOFI BAYETE, | : |
| Plaintiff, | : |
| v. | : Civil Action No. 08-3941 (GEB) |
| | : MEMORANDUM OPINION |
| MICHELLE RICCI, et al. | : |
| Defendants. | : |

BROWN, Chief Judge

This matter comes before the Court upon Defendants Michelle Ricci and Donald Mee's

Motion for Summary Judgment (Docket Entry No. 79) and Defendant Allan Martin's Motion to Dismiss

and/or Summary Judgment (Docket Entry No. 97).  Pro se Plaintiff Kofi Bayete ("Plaintiff") filed

Opposition to both Motions.  (Docket Entry Nos. 80 and 104.)  Defendants Michelle Ricci and Donald

Mee and Allan Martin (collectively, "Defendants") did not file replies.  Also pending before the Court

is Plaintiff's Appeal of the Magistrate Judge's denial of pro bono counsel.  (Docket Entry No. 103.)

Defendant Allan Martin filed opposition to Plaintiff's appeal.  (Docket Entry No. 105 & 106.)  The

Court has reviewed the parties' submissions and decided the motions without oral argument pursuant

to Federal Rule of Civil Procedure 78.  For the reasons that follow, the Court will grant Defendants'

motion and deny Plaintiff's appeal.

## I. Defendants Ricci and Mee's Motion for Summary Judgment[1]

### A. Factual Background

Plaintiff is an inmate incarcerated at New Jersey State Prison ("NJSP") serving a life sentence with a mandatory minimum of thirty-five years. (Ricci/Mee Statement of Material Facts, ¶1.)  In his Amended Complaint, Plaintiff alleges that Defendant Ricci, Administrator of NJSP, and Defendant Mee, former Assistant Superintendent of NJSP, violated his state and federal constitutional rights by ordering a facility-wide lockdown, during which inmates were confined to their cells twenty-four hours a day, thereby depriving Plaintiff of access to medical care. (Pl.'s Am. Compl.)  On August 4, 2006, said lockdown was initiated. (Ricci/Mee Statement of Material Facts, ¶3.)  The lockdown remained in effect until August 21, 2006. (*Id.* at ¶4.)  Defendants Ricci and Mee maintain that there was no order given prohibiting the transfer of inmates to the medical department or an outside hospital and  inmate movement was restricted to medical emergency passes and court appearances. (Ricci/Mee Statement of Material Facts, ¶¶ 5,7.)  In his Opposition, Plaintiff alleges that Defendants Ricci and Mee ordered that inmates were not to be sent to the medical clinic for any reason. (Pl.'s Statement of Facts, ¶5; Pl.'s Am. Compl., ¶10.)

In NJSP, if an inmate is unable to be escorted to the clinic, the medical provider is required to send a nurse to the inmate's cell to triage the inmate and determine whether it is a medical emergency requiring a trip to the medical department. (Ricci/Mee Statement of Material Facts, ¶11.)  Plaintiff

---

[1] When an amended complaint is filed, the original complaint no longer performs any function in the case and "cannot be utilized to cure defects in the amended [complaint], unless the relevant portion is specifically incorporated in the new [complaint]." 6 Wright, Miller & Kane, Federal Practice and Procedure § 1476 (2d ed. 1990) (footnotes omitted). An amended complaint may adopt some or all of the allegations in the original complaint, but the identification of the particular allegations to be adopted must be clear and explicit. *See id.*  In this case, Plaintiff's original complaint and first amended complaint name Michelle Ricci and Donald Mee as Defendants however, his second amended complaint, which is the operative complaint, does not name them as defendants. Therefore, Ms. Ricci and Mr. Mee are technically no longer defendants in this action and as such, the claims against them would be dismissed on this ground alone.

alleges that the day after the lockdown at NJSP began, he noticed redness and swelling on the bottom of his left foot. (Pl.'s Am. Compl., ¶ 10; Ricci/Mee Statement of Material Facts, ¶20.)  There are conflicting statements from Plaintiff as to when he was seen by a medical provider. (*See* Pl.'s First Am. Compl. ¶11; Scott Decl., Ex. C, Trans. Pl.'s Dep. at 25:13-16, 31:8-32:7, 33:15-17.)  However, based on statements made in his deposition and the prison's medical records, it appears that Plaintiff was seen in his cell by Dr. Martin, Nurse Berry and Social Worker Lukin during the lockdown.  (Ricci/Mee Statement of Material Facts, ¶ ¶24, 28, 31.)

On ten occasions during the NJSP lockdown from August 4 to August 21, 2006, medical providers had inmates removed from their housing units and taken to the medical department for medical treatment. (Ricci/Mee Statement of Material Facts, ¶ 17.)  Further, on twenty occasions during the same time period, medical care providers had inmates removed from NJSP and taken to St. Francis Medical Center for medical treatment. (*Id.* at ¶18.)  Plaintiff admitted in his deposition that he is aware of other inmates being taken to the prison medical clinic and outside hospitals during the lockdown period. (Scott Decl., Ex. C, Trans. Pl.'s Dep. at 45:22-46:2, 62:17-19.)  On August 31, 2006, an officer on Plaintiff's housing unit called a medical emergency code due to Plaintiff's complaints of pain and swelling in his left foot. (Ricci/Mee Statement of Material Facts, ¶35.)  Following the emergency code, Nurse Practitioner Liane Paixao-Illa evaluated Plaintiff in the medical department.  (*Id.* at ¶36.)  Plaintiff complained of severe left foot pain and swelling.  (*Id.* at ¶37.)  At that time, Plaintiff was sent to the emergency room at St. Francis Medical Center.  (*Id.* at ¶38.)  Plaintiff remained at St. Francis Medical Center until September 6, 2006, when he was discharged. (*Id.* at ¶39.)  The St. Francis Medical Center discharge summary indicates that Plaintiff had been diagnosed with cellulitis, an inflammation of the cellular tissue below the skin, of the left ankle. (*Id.* at ¶40.)  He was prescribed intravenous

antibiotics for twenty-eight days. (*Id.* at ¶41.) Upon his return from St. Francis Medical Center, Plaintiff was admitted into the prison infirmary where he remained until October 4, 2006, when he completed his intravenous antibiotics and was discharged. (*Id.* at ¶42.)

## B. Procedural History

On February 27, 2009, Defendants Ricci and Mee filed their First Motion to Dismiss and/or for Summary Judgment. (Docket Entry No. 34; "Defendants' First Motion for Summary Judgment".) In opposition to Defendants' First Motion for Summary Judgment, Plaintiff provided a certification, in which he states that "[d]uring the lockdown [D]efendants Ricci and Mee suspended all inmate appointments for primary care at the prison medical clinic and disallowed the normal primary physician care provided at the medical clinic. Defendants also disallowed all emergency medical passes." (Docket Entry No. 30 at 17.) Plaintiff then asserted that, after noticing an infection in his foot shortly after Defendants ordered the lockdown, Dr. Martin came to examine his foot but would not open Plaintiff's cell door due to Defendants' orders. (*Id.* at 17-18.) Plaintiff also maintained that, following Dr. Martin's visit, the condition of his foot deteriorated to the point where he feared he would lose his foot. (*Id.* at 18.) Plaintiff also certified that, although the swelling and pain in his foot increased, housing unit officers continually denied him emergency medical passes due to Defendants' orders. (*Id.*) Finally, Plaintiff certified that it was not until August 31, 2006, when his foot had swollen to twice its normal size, that a housing unit officer transmitted an emergency code to provide medical care for Plaintiff. (*Id.*)

Upon reviewing the parties' submissions, this Court issued Its opinion on July 10, 2009 and concluded that Defendants' First Motion for Summary Judgment should be denied as there were disputed issues of material fact that remained unresolved. Specifically, this Court found that underlying

4

Plaintiff's arguments for each cause of action is his allegation that he did not receive medical care. (*See generally* Docket Entry No. 30, Ex. A.) Defendants denied this and alleged that Plaintiff did receive medical care and present records from Plaintiff's medical visits during the lockdown. (*See generally* Decl. of Brenda A. Hutton; Docket Entry Nos. 22-2, 22-3.) Thus, genuine issues of material fact remained and this Court denied Defendants' First Motion for Summary Judgment.

After the discovery period concluded, Defendants filed the instant summary judgment motions now pending before this Court.

## C. Discussion

### 1. Legal Standard

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Hersh v. Allen Prods. Co. Inc., 789 F.2d 230, 232 (3d Cir. 1986). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor). In deciding whether triable issues of fact exist, the court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995); *Hancock Indus. v. Schaeffer*, 811 F.2d 225, 231 (3d Cir. 1987).

**2. Legal Analysis**

**a. Official Capacity Claims Against Defendants Ricci and Mee**

For the reasons stated in this Court's Memorandum Opinion and Order of July 10, 2009,

Plaintiff's claims against Defendants in their official capacity are hereby dismissed.

**b. Eighth Amendment - Deliberate Indifference**

Plaintiff alleges that by instituting the prison-wide lockdown of NJSP and preventing inmates

from obtaining medical care through the normal medical care delivery system,  Defendants Ricci and

Mee were deliberately indifferent to Plaintiff's medical needs. (Pl.'s First Am. Comp. ¶15.) Plaintiff's

claims against Defendants Ricci and Mee are based on the theory of supervisor liability.     Individuals

may not be found liable under § 1983 pursuant to a *respondeat superior* theory of liability. *Polk County*

*v. Dodson*, 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981). Rather, a defendant in a

supervisory role "must have personal involvement in the alleged wrongs." *Rode v. Dellarciprete*, 845

F.2d 1195, 1207 (3d Cir.1988).  The test set forth by the Third Circuit in *Sample v. Diecks*, 885 F.2d

1099 (3d Cir.1989) provides the analytical structure for determining whether the policymakers exhibited

deliberate indifference to the plaintiffs' risk of injury.... *Beers-Capitol v. Whetzel*, 256 F.3d 120, 135

(3d Cir. 2001). The *Sample* test states that "to hold a supervisor liable because his policies or practices

led to an Eighth Amendment violation, the plaintiff must identify a specific policy or practice that the

supervisor failed to employ and show that: (1) the existing policy or practice created an unreasonable

risk of the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was

created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or

practice." *See Sample*, 885 F.2d at 1118.

Citing their interrogatory answers, Defendants argue that they did not implement a policy

6

prohibiting inmate medical treatment or the transfer of inmates to the medical clinic or an outside hospital during the NJSP lockdown. (Defs. Ricci/Mee's Br. 17; Scott Decl., Ex. A at Nos. 2, 5-7, 21-24; Ex. B at Nos. 1-3, 11, 15-17, 25.) Defendants further argue that the polices and procedures governing the provision of medical care to inmates at NJSP are not changed during a lockdown. (*Id.*; Holmes Decl., ¶ 9.) Defendants further argue that Plaintiff himself even admitted that other inmates were taken to the prison medical clinic and outside hospitals during that period. (*Id.*; Scott Decl., Ex. C at T45:22-46:2, 62:17-19.) Defendants further argue that on thirty occasions during the lockdown, medical providers had inmates removed from their housing units and taken to either the medical department or an outside hospital for treatment. (*See* Hutton Decl., Ex. D.) Defendants further argue that during his deposition, Plaintiff conceded that it was possible that the prison medical staff determined that while the removal of the other inmates was medically necessary, his removal was not. (*Id.* at 18; Scott Decl., Ex C. at T117:2-5.) Finally, Defendants also argue that with regard to Plaintiff's access to medical care, Plaintiff admitted that he was seen by medical care providers during the lockdown. (*Id.*; Scott Decl., Ex. D at 25:13-16, 31:8-32:7, 33:15-17.)

Though Plaintiff filed a statement of facts, as his opposition, said statement is not a counter-statement which agrees or disagrees with each of Defendants' facts. Rather, Plaintiff just provides his own facts. As such, it is not entirely clear to the Court which facts are in dispute. At the very least, it is clear that Plaintiff alleges that Defendants ordered that the inmates were not to be sent to the prison medical clinic for any reason during the lockdown. (Pl.'s Statement of Facts, ¶5.) Plaintiff does not cite to anything in the record to support this statement. Plaintiff does attach prison medical records and hospital records to his statement of facts, however, the records do not appear to provide support for his statement. Plaintiff does not provide a certification or other sworn statement in opposition.

7

Before even applying the *Sample* factors, there must first be a policy that was implemented by Defendants. *See Sample*, 885 F.2d at 1118. In this case, Defendants have argued, and provided support, for the fact that they did not order that inmates were not to be sent to the prison medical clinic or hospital for any reason during the lockdown. Both Defendant Ricci and Defendant Mee provided certified interrogatory answers which stated that no order was given prohibiting inmates from going to the hospital. Though Plaintiff has alleged that Defendants gave such an order in his Complaint, his deposition and opposition to the instant motion, Plaintiff has not provided any admissible evidence in support of his statements.[2] Further, Plaintiff acknowledged during his deposition that he was aware of other inmates being taken to Saint Francis Medical Center for treatment during the lockdown. (Scott Decl., Ex. C, Pl.'s Dep. Tr. at 45:22-46:2, 62:17-19.). In light of the evidence put forth by Defendants in support of their contention that no order was given and the lack of evidence from Plaintiff, the Court finds that there is no genuine issue of material fact regarding whether Defendants gave an order prohibiting inmates from going to the hospital while the prison was in lockdown. Since Plaintiff's claim against Defendants Ricci and Mee is based on supervisor liability and Defendants met their burden to show that there was no policy in place prohibiting inmates from going to the hospital, Defendants motion for summary judgment on Plaintiff's claim that Defendants were deliberately indifferent to his medical needs will be granted.

---

[2] In his deposition, Plaintiff alleges that various guards told him that he could not go to the clinic or hospital because an order had been given that inmates were not permitted to leave their cells for any reason. (*See e.g.* Pl.'s Dep. Tr. 15:6-14; 25:15-19; 31:2-7; 32:2-7; 33:20-24; 39:3-8; 49:24-50:3:; 65:21-23; 68:20-24.) However, the standard for summary judgment requires that a party opposing summary judgment must do more than rest upon mere allegations, general denials, or vague statements. *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir.2001). Here, Plaintiff has not provided any testimony or affidavits from any of the guards who allegedly told him that an order was given. Rather, Plaintiff has only offered inadmissible hearsay. *Watkins v. Cape May County Correctional Center*, No. 04-4967 (NLH), 2006 WL 2865466, at *5, n.4 (D.N.J. October 03, 2006)(finding that summary judgment is appropriate when Plaintiff only put forth his own deposition testimony recounting his conversation with a third party)) (internal citation omitted).

### c. Fourteenth Amendment - Due Process

Plaintiff alleges that "by denying Plaintiff medical care during the lockdown of August 2006 defendants inflicted an atypical and significant hardship on plaintiff while acting under the color of state law in violation of 42 U.S.C. §1983 the Due Process Clause to the Fourteenth Amendment to the Constitution of the United States." (Pl.'s First Am. Compl. ¶3.)

A liberty or property interest protected by the Due Process Clause may arise from either of two sources: from the Due Process Clause itself or from statute or regulation. *See Hewitt v. Helms*, 459 U.S. 460, 466, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *Asquith v. Department of Corrections*, 186 F.3d 407, 409 (3d Cir.1999). With respect to convicted and sentenced prisoners, "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Montanye v. Haymes*, 427 U.S. 236, 242, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976) (quoted in *Hewitt*, 459 U.S. at 468 and *Sandin v. Conner*, 515 U.S. 472, 480, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Cf. Washington v. Harper, 494 U.S. 210, 221-22, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (prisoner has liberty interest under the Due Process Clause in freedom from involuntary administration of psychotropic drugs); *Vitek v. Jones*, 445 U.S. 480, 493-94, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (prisoner has liberty interest under the Due Process Clause in freedom from involuntary transfer to state mental hospital coupled with mandatory treatment for mental illness, a punishment carrying "stigmatizing consequences" and "qualitatively different" from punishment characteristically suffered by one convicted of a crime).

Governments, however, by statute or regulation, may confer on prisoners liberty interests that are protected by the Due Process Clause. "But these interests will be generally limited to freedom from

restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484 (finding that disciplinary segregation conditions which effectively mirrored those of administrative segregation and protective custody were not "atypical and significant hardships" in which a state conceivably might create liberty interest). Whether a prison condition constitutes an "atypical and significant hardship" depends on what an inmate may reasonably expect to encounter as a result of his conviction in accordance with due process of law, the amount of time a prisoner was placed into disciplinary segregation, and whether conditions of the prisoners confinement were significantly more restrictive than those imposed upon other inmates. *Fraise v. Terhune*, 283 F.3d 506, 522 (3d Cir.2002); *Shoats v. Horn*, 213 F.3d 140, 142 (3d Cir.2000).

Generally, however, prisoners under confinement do not have inherent liberty interests in particular modes, places or features of confinement or custody. *Asquith v. Volunteers of America*, 1 F.Supp.2d 405, 410 (D.N.J. 1998) (citing *Hewitt*, 459 U.S. at 466-68 (confinement to general prison population cell rather than restrictive administrative segregation quarters); *Higgason v. Farley*, 83 F.3d 807, 809 (7th Cir.1996) (lockdowns and prohibitions against leaving cell area)).    As stated above, the Court finds that Defendants have established that they did not order that inmates were not permitted to be sent to the hospital during the lockdown. Further, Defendants have alleged and Plaintiff has agreed that during the lockdown, Plaintiff was seen by Dr. Martin, Nurse Berry and a social worker. (Hutton Decl., Ex. C at EMR001- EMR016; Scott Decl., Ex. D at 25:13-16, 31:8-32:7, 33:15-17.) Plaintiff was provided medical care during the lockdown and was not subject to atypical and significant hardship. Therefore, Defendants' Motion for Summary Judgment on Plaintiff's Due Process claim will be

granted.

### d. Eighth Amendment - Cruel and Unusual Punishment

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *See Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). In order to set forth a cognizable claim for a violation of his right to adequate medical care, an inmate must allege a serious medical need and behavior on the part of prison officials that constitutes deliberate indifference to that need. *See id.* at 106.

To satisfy the first prong of the *Estelle* inquiry, the inmate must demonstrate that his medical needs are serious. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Serious medical needs include those that have been diagnosed by a physician as requiring treatment or that are so obvious that a lay person would recognize the necessity for a doctor's attention, and those conditions which, if untreated, would result in lifelong handicap or permanent loss. *See Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir.1987).

The second element of the *Estelle* test requires an inmate to show that prison officials acted with deliberate indifference to his serious medical need. "Deliberate indifference" is more than mere malpractice or negligence; it is a state of mind equivalent to reckless disregard of a known risk of harm. *Farmer v. Brennan*, 511 U.S. 825, 837-38 (1994). Furthermore, a prisoner's subjective dissatisfaction with his medical care does not in itself indicate deliberate indifference. *Andrews v. Camden County*, 95 F.Supp.2d 217, 228 (D.N.J.2000); *Peterson v. Davis*, 551 F.Supp. 137, 145 (D.Md.1982), aff'd, 729 F.2d 1453 (4th Cir.1984). Similarly, "mere disagreements over medical judgment do not state Eighth

Amendment claims." *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir.1990). "Courts will disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment ... [which] remains a question of sound professional judgment." *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir.1979) (internal quotation and citation omitted). Even if a doctor's judgment concerning the proper course of a prisoner's treatment ultimately is shown to be mistaken, at most what would be proved is medical malpractice and not an Eighth Amendment violation. *See Estelle*, 429 U.S. at 105-06; *White*, 897 F.3d at 110.

Therefore, in summary:

> Where prison authorities deny reasonable requests for medical treatment, however, and such denial exposes the inmate "to undue suffering or the threat of tangible residual injury," deliberate indifference is manifest. Similarly, where "knowledge of the need for medical care [is accompanied by the] ... intentional refusal to provide that care," the deliberate indifference standard has been met.... Finally, deliberate indifference is demonstrated "[w]hen ... prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to a physician capable of evaluating the need for such treatment."

*Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir.1987) (internal citations omitted).

As stated above, the Court finds that Defendants have established that they did not order that no inmates were permitted to be sent to the hospital during the lockdown, as evidenced by the fact that on ten occasions during the lockdown, medical providers had inmates removed from their housing units and taken to the medical department and on twenty occasions during the same time period, medical care providers had inmates removed from NJSP and taken to St. Francis Medical Center for medical treatment. (Ricci/Mee Statement of Material Facts, ¶¶ 17-18.) Further, Defendants have alleged and Plaintiff has agreed that during the lockdown, Plaintiff was seen by Dr. Martin, Nurse Berry and a social

12

worker. (Hutton Decl., Ex. C at EMR001- EMR016; Scott Decl., Ex. D at 25:13-16, 31:8-32:7, 33:15-17.) Therefore, it is clear that Plaintiff was provided medical care during the lockdown. The medical personnel, who are responsible for the provision of care to the inmates, saw Plaintiff and determined that the status of his foot did not warrant sending him to the medical department or St. Francis until August 31st. Since Plaintiff was not denied medical care, at most, this would, at most, be considered medical malpractice, not deliberate indifference. Therefore, Defendants' Motion for Summary Judgment on Plaintiff's Eight Amendment cruel and unusual punishment claim will be granted.

### e. Plaintiff's State Law Claims

Plaintiff also brings a claim against Defendants for cruel and unusual punishment pursuant to the New Jersey Civil Rights Act ("NJCRA"), N.J. Stat. Ann. § 10:6-2(c). "Courts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart: Section 1983...." *Stroby v. Egg Harbor Tp.*, 2010 WL 5036982, at n.5 (D.N.J. December 10, 2010)(quoting *Chapman v. State of New Jersey*, 2009 U.S. Dist. LEXIS 75720 at *7 (D.N.J. Aug. 25, 2009)). The NJCRA was intended to serve as an analog to 42 U.S.C. § 1983; it was designed to "incorporate and integrate seamlessly" with existing civil rights jurisprudence. *Id.; see Ross v. Monge*, No. 07-2693(RMB), 2009 U.S. Dist. LEXIS 38029, at *4 n. 4, 2009 WL 1291814 (D.N.J. May 4, 2009); *Jumpp v. T.M. Power*, No. 08-4268(JLL), 2009 U.S. Dist. LEXIS 51269, at *10, 2009 WL 1704307 (D.N.J. June 19, 2009).

Therefore, "[b]ecause courts have interpreted [the NJCRA] to have the same legal considerations as its Eighth Amendment counterpoint," the Court will grant Defendants' motions for summary judgment on Plaintiff's NJCRA claims for the same reasons as those stated above with regard to Plaintiff's Eighth Amendment claims. *Edwards v. Correctional Medical Services*, 2010 WL 920020,

at *4 (D.N.J. March 09, 2010).

## II. Defendant Allan Martin's Motion for Summary Judgment

## A. Factual Background

Defendant Dr. Allan Martin's Motion to Dismiss in lieu of an Answer or in the alternative, for

Summary Judgment, relies primarily on the same material facts as that of Defendants Mee and Ricci.

Only the relevant facts are recited below.

Plaintiff alleges that the day after the lockdown at NJSP began he noticed redness and swelling

on the bottom of his left foot. (Def. Martin's Statement of Material Facts, ¶15; Pl.'s Am. Compl., ¶ 10.)

In his Complaint, Plaintiff further alleges that despite using the typical medical call procedures, he was

not seen by medical staff for approximately three weeks. (*Id.* at ¶16; Pl.'s Am. Compl., ¶11.) However,

Defendant states that Plaintiff's medical records show that he was seen by Dr. Allan Martin on August

11, 2006. (*Id.* at ¶17; Def. Martin's Ex B., Aug. 11, 2006 EMR Entry.) Further, Plaintiff's certification

which he submitted to this Court in opposition to Defendants Ricci and Mee's original motion to

dismiss in May 2009, states that Dr. Martin came to his cell to "inquire about his medical problem."

(Docket Entry No. 30, Ex. A.) According to the medical records, during this visit, Plaintiff advised Dr.

Martin that he was awaiting knee replacement surgery and complained that his knee was "buckling"

under him and he was in constant pain. (*Id.* at ¶18.) Also according to the medical records, at no point

during this visit did Plaintiff complain of any pain, redness or swelling his left foot. (*Id.* at ¶19.)

Defendant Martin states that the first time Plaintiff made any mention of his foot was in his

August18, 2006 health services request form. (*Id.* at ¶20; Def. Martin's Ex C.) In response, Plaintiff

was evaluated that day at his cell door by Juluander Berry, R.N. (*Id.* at ¶21; Def. Martin's Ex D.)

Plaintiff complained of pain in his left knee and foot and Nurse Berry observed Plaintiff's left foot to

14

be swollen and indicated he would be referred for an evaluation by the doctor. (*Id.* at ¶¶22-23.) On August 31, 2006, an officer on Plaintiff's housing unit called a medical emergency code and following the emergency code, Nurse Practitioner Liane Paixao-Illa evaluated Plaintiff in the medical department. (*Id.* at ¶26; Def. Martin's Ex E.) After an examination, Plaintiff was sent to the emergency room at St. Francis Medical Center, where he remained until September 6, 2006, when he was discharged with a diagnosis of cellutitis. (*Id.* at ¶¶27-28.)

Plaintiff alleges that he was given Toradol at some point in September 2006, without anyone checking to see if he had an allergy to said medication. (*Id.* at ¶29; Pl.'s Compl. ¶¶8-9.) After he given Toradol, he had an allergic reaction and as a result, Plaintiff was sent to the emergency room at St. Francis Medical Center. (*Id.* at ¶30.) According to Plaintiff's medical records, this incident occurred on or about October 11, 2006. (*Id.* at ¶31; Def. Martin's Ex G.)

As with Defendants Mee and Ricci's Motion, though Plaintiff filed a statement of facts, as his opposition, said statement is not a counter-statement which agrees or disagrees with each of Defendants' facts. Rather, Plaintiff only provides his own facts. As such, it is not entirely clear to the Court which facts are in dispute. It appears that Plaintiff argues that Defendant Martin did not physically examine Plaintiff to take any vital signs or otherwise, as he only examined Plaintiff through the cell door. (Pl.'s Statement of Facts, ¶1.)

## B. Discussion

### 1. Legal Standard

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Hersh v. Allen Prods. Co. Inc., 789 F.2d 230, 232

(3d Cir. 1986). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor). In deciding whether triable issues of fact exist, the court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995); *Hancock Indus. v. Schaeffer*, 811 F.2d 225, 231 (3d Cir. 1987).

**2. Legal Analysis**

**a. Eighth Amendment - Deliberate Indifference**

The Eighth Amendment provides the constitutional basis for a Section 1983 claim filed by a prisoner alleging deprivation of medical treatment. *See Estelle v. J.W. Gamble*, 429 U.S. 97, 102-03 (1976) (The Eighth Amendment establishes "the government's obligation to provide medical care for those whom it is punishing by incarceration.") Failure to provide medical treatment is actionable only if it results in "unnecessary and wanton infliction of pain." *Id.* at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976.)). To plead a prima facie Eighth Amendment claim, a plaintiff must allege that the defendants acted with "deliberate indifference" to his "serious medical needs." *Estelle*, 429 U.S. at 104. Courts have treated this standard as a two-prong test, separately examining whether the defendants acted with "deliberate indifference" and also whether the plaintiff's medical needs were sufficiently "serious." *See, e.g., Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir.1979); *Taylor*, 101 F.Supp.2d at 262.

The "deliberate-indifference" standard is stringent. Mere allegations of medical negligence are

16

insufficient. *Estelle*, 429 U.S. 106. This standard is met when defendants deny reasonable requests for medical care and thereby expose the plaintiff "to undue suffering or the threat of tangible injury" or when defendants know the plaintiff needs medical care, but intentionally refuse to provide it. *Monmouth County Correctional Institution Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir.1987) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir.1976)).

The "deliberate-indifference" standard is not met when a plaintiff or another medical professional merely disagree with the defendants' diagnosis or chosen course of treatment. *Estelle*, 429 U.S. 107; *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir.1990) (No Eighth Amendment violation is stated "when a doctor disagrees with the professional judgment of another doctor. There may, for example, be several acceptable ways to treat an illness."). Generally, prison authorities are afforded considerable latitude in the diagnosis and treatment of prisoners. Courts will not second-guess a chosen treatment plan that is a question of the physician's sound professional judgement and chosen after the physician has informed himself of the prisoner's illness. *Inmates of Allegheny County Jail*, 612 F.2d at 762.

In this case, Defendant Martin argues, and it is supported by Plaintiff's medical records, that when Defendant Martin saw Plaintiff on August 11, 2006, Plaintiff did not mention pain in his foot, but rather complained about his knee buckling and constant pain. (EMR001.) The medical records also show that a previous physician indicated that Plaintiff would be scheduled for a total knee replacement. (*Id.*) Plaintiff filed two medical request forms, one on August 18, 2006 and one on August 23, 2006. (Docket Entry No. 77.) In his August 23rd form, Plaintiff stated that he had been having pain in his foot for about eight days. (*Id.*)

According to the medical records, when Defendant Martin came to Plaintiff's cell on August

11th, Plaintiff did not inform Dr. Martin of any problems with his foot.  Plaintiff has failed to provide

this Court with any evidence, other than his own Statement of Facts, with no evidentiary support, to the

contrary.  Defendant Martin prescribed acetaminophen for Plaintiff's knee as a result of his examination

of Plaintiff on August 11th.  Plaintiff has also failed to provide any evidence or support that would

indicate that Dr. Martin was deliberately indifferent to Plaintiff's needs.  Plaintiff's allegation that

Defendant Martin failed to adequately diagnose or treat Plaintiff's foot, would, if anything, more

appropriately be characterized as a claim for medical malpractice or negligence.  As such, the Court will

grant Defendant Martin's motion for summary judgment.[3]

### b. State Law Claims

For the reasons stated above in reference to the state law claims against Defendants Ricci and

Mee, the Court will grant Defendant Martin's motion for summary judgment with regard to Plaintiff's

state law claim.

### III. Plaintiff's Appeal of the Magistrate Judge's Denial of Pro Bono Counsel

### A. Factual Background

On August 17, 2010, Plaintiff filed an appeal of the Magistrate Judge's oral order of August 12,

2010 denying him pro bono counsel.  (Docket Entry No. 103.)  In support of his appeal, Plaintiff argues

generally that he is "no match" for the attorneys representing the state and Dr. Martin and that  he did

not receive responses to the requests for admission that he submitted to Dr. Martin and was told to wait

until a decision is rendered regarding Dr. Martin's Motion to Dismiss or in the alternative, for Summary

Judgment.

---

[3]To the extent Plaintiff attempts to argue that Defendant Martin is responsible for the implementation of the alleged policy preventing inmates from being transported to the hospital or clinic during the lockdown, Plaintiff has provided no evidence or support for such a claim.  Moreover, as discussed above, Plaintiff also has provided no support for his claim that such a policy existed.

**B. Discussion**

**1. Legal Standard**

Pursuant to 28 U.S.C. § 636(b)(1)(A), Federal Rule of Civil Procedure 72(a), and Local Civil

Rule 72.1(a), a United States Magistrate Judge may hear non-dispositive motions. On appeal, a district

court may modify or set aside a magistrate judge's non-dispositive order if the ruling was "clearly

erroneous or contrary to law." FED.R.CIV.P. 72(a); L. CIV. R. 72.1(c)(1) (A); *see also Haines v. Liggett*

*Group Inc.*, 975 F.2d 81, 91 (3d Cir. 1992); *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1113 (3d

Cir. 1986). A ruling is clearly erroneous "when although there is evidence to support it, the reviewing

court on the entire evidence is left with the definite and firm conviction that a mistake has been

committed." *Dome Petroleum Ltd. v. Employers Mut. Liab. Ins. Co.*, 131 F.R.D. 63, 65 (D.N.J. 1990)

(quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). A magistrate judge's order is

contrary to law "when the magistrate judge has misinterpreted or misapplied the applicable law." *Doe*

*v. Hartford Life & Accident Ins. Co.*, 237 F.R.D. 545, 548 (D.N.J. 2006) (citing *Pharm. Sales &*

*Consulting Corp. v. J.W.S. Delavau Co.*, 106 F.Supp.2d 761, 764 (D.N.J. 2000)). "Some courts find

that 'where an appeal seeks review of a procedural matter that a magistrate judge routinely is called

upon to decide such as appointment of pro bono counsel, the 'abuse of discretion' standard' may be

applied.'" *Hennessey v. Atlantic County Dept. of Public Safety*, No. 06-143 (NLH), 2008 WL 4691990,

at *2 (D.N.J. October 22, 2008) (citing *Rhett v. New Jersey*, No. 07-131 (DRD), 2007 WL 1456199,

at *2 (D.N.J. May 14, 2007). "An abuse of discretion occurs: when the judicial action is arbitrary,

fanciful or unreasonable, which is another way of saying that discretion is abused only where no

reasonable man would take the view adopted." *Leap Sys., Inc. v. Moneytrax, Inc.*, No. 05-1521, 2010

WL 2232715, at *3 (D.N.J. June 1, 2010) (internal quotations and citations omitted). As was the case

in *Hennessey*, because this Court finds that the Magistrate Judge's ruling was not clearly erroneous or contrary to law, it is not necessary to apply the more deferential "abuse of discretion" standard.

## 2. Analysis

Appointment of counsel under 28 U.S.C. §1915(e)(1) may be made at any point in the litigation and may be made by the Court *sua sponte*. *See Tabron v. Grace*, 6 F.3d 147, 156 (3d Cir. 1993), cert. denied, 510 U.S. 1196 (1994). The plaintiff has no right to counsel in a civil case. *Id.* at 153-54; *Parham v. Johnson*, 126 F.3d 454, 456-57 (3d Cir. 1997). In evaluating a motion to appoint counsel, the court must first examine the merits of Plaintiff's claim to determine if it has "some arguable merit in fact and law." *See Tunnell v. Gardell*, 2003 WL 1463394, at * 1 (D.Del. Mar. 14, 2003)(citing *Parham*, 126 F.3d at 457) (other citations omitted). If the court is satisfied that the claim is "factually and legally meritorious," then the following factors must be examined: (1) a plaintiff's ability to present his or her own case; (2) the complexity of the legal issues; (3) the degree to which factual investigation will be necessary and the ability of a plaintiff to pursue such investigation; (4) the amount a case is likely to turn on credibility determinations; (5) whether the case will require the testimony of expert witnesses; and (6) whether a plaintiff can attain and afford counsel on his or her own behalf. *Id.* (citing *Parham*, 126 F.3d at 457-58; *Tabron*, 6 F.3d at 155-56, 157 n. 5). However, a court should also consider other factors, such as the lack of funding to pay appointed counsel, the limited supply of competent lawyers willing to do pro bono work, and the value of lawyers' time. *See Tabron*, 6 F.3d at 157-58.

The magistrate judge in this case found that appointment of pro bono counsel is not warranted. This Court also finds that appointment of a pro bono attorney is not warranted. Looking at the *Tabron* factors, the Court finds that Plaintiff has shown that he is more than capable of presenting his own case,

as he has filed several motions and letters without the aid of counsel. He has also opposed a motion to dismiss and two summary judgment motions. Further, the legal issues in this case appear to be relatively straightforward. Factual investigation will not be an issue as it appears that Plaintiff was intimately involved with all aspects of the alleged incidents. Further, the Court notes that this case has reached the summary judgment stage and as discussed above, the Court will grant Defendants' motions. Though the Court concedes that the final three factors may weigh slightly in favor of appointment of counsel, the Court must also consider other factors such as the lack of funding to pay appointed counsel, the limited supply of competent lawyers willing to do pro bono work, and the value of lawyers' time. In this case, looking at the relevant factors and given the status of the case at this point, the Court finds that appointment of pro bono counsel is not appropriate. Therefore, the Court will affirm the Magistrate Judge's denial of pro bono counsel.

## III. Conclusion

For the reasons stated above, the Court will grant Defendants' motions for summary judgment and deny Plaintiff's appeal of the magistrate judge's order. An appropriate order follows.

_____
GARRETT E. BROWN, JR., Chief Judge
United States District Court

Dated: JANUARY 7, 2011